**EXPRESS PUB. CO. v. KEERAN.**
(No. 7395.)

(Court of Civil Appeals of Texas. San Antonio. June 18, 1925. Rehearing Denied July 6, 1925.)

1. Evidence �köm5(2)—Common knowledge that labels on liquor containers raise no presumption as to where their contents have been brewed.

It is a matter of common knowledge that labels on liquor containers raise no presumption as to where their contents have been brewed.

2. Appeal and error �köm742(2)—Proposition of law on appeal, in direct contravention of rules prescribed by Supreme Court, would have been disregarded on objection.

Proposition of law urged on appeal, embracing whole case, and of its own force presenting five different propositions of law predicated on 30 separate assignments of error, in each of which complaint was made of a specific issue, some of law, others of fact, was in direct contravention of rules prescribed by Supreme Court, and on proper objection would have been disregarded by reviewing tribunal.

3. Libel and slander ⊖☞19—Publications alleged to constitute libel must be considered together.

Publications, which are alleged to constitute libel, must be considered together.

4. Libel and slander ⊖☞49—Publication of complaint, charging plaintiff with violation of the prohibition act, held not to constitute a fair and impartial account of that proceeding.

In suit for libel, publication of complaint charging plaintiff with violation of National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.), for unlawful transportation of three cases of smuggled liquor, so as to authorize inference that he was head and front and controlling influence of all smuggling and bootlegging forces, supplying a vast territory with intoxicating liquors, and that he was leading such forces as a commercial vendor, and disposing of vast quantities of liquor as a business and for profit, *held* not to constitute a fair, true, and impartial account of that proceeding.

5. Affidavits ⊖☞18—Ex parte affidavit held inadmissible where affiant was in courtroom when presented.

In suit for libel, affidavit offered by defendant *held* inadmissible, where it was ex parte, and affiant was present in courtroom when it was presented.

6. Pleading ⊖☞364(2)—Ex parte affidavit had no proper place in pleadings.

In suit for libel, ex parte affidavit had no place in defendant's pleadings.

7. Appeal and error ⊖☞882(9)—Any error in admitting witness' answers to cross-interrogatories in deposition held harmless.

In suit for libel with defendant putting in evidence witness' answers to direct interrogatories propounded to him by defendant in deposition, any error in admitting witness' answers to cross-interrogatories propounded by plaintiff *held* harmless, where defendant brought out substantially same facts in its direct examination of such witness.

8. Appeal and error ⊖☞548(5)—Exclusion of evidence held not presented for review, where no bill of exceptions taken.

Exclusion of answer of witness to interrogatories was not presented for review, where no bill of exceptions appeared to have been taken to court's action.

9. Libel and slander ⊖☞100(1)—Exclusion of testimony, which was material only on question of punitive damages, held not erroneous, where plaintiff was suing for actual damages only.

In suit against newspaper for libel for publication of articles imputing plaintiff to be head of smuggling and bootlegging forces, testimony that a reporter had written articles on facts obtained from a federal agent and a state ranger, *held* properly excluded, where plaintiff was suing for actual damages only, and question of punitive damages, to which excluded testimony was material, was not in issue.

---

⊖☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**10. Libel and slander ⊕⇒49—Newspapers and periodicals must be sure of their ground before proclaiming guilt of citizens of high crimes and misdemeanors.**

It is duty of newspapers and other periodicals to be sure of their grounds before proclaiming guilt of citizens of high crimes and misdemeanors.

**11. Appeal and error ⊕⇒740(2)—Assignment of error held objectionable as being multifarious.**

Assignment of error complaining of trial court's finding of facts and conclusions of law, and each finding and conclusion relating to a distinct issue and question, was objectionable as being multifarious.

**12. Appeal and error ⊕⇒1071(1)—Any error in trial court's findings of fact and conclusions of law held immaterial.**

In suit for libel, any error in trial court's findings of fact and conclusions of law *held* immaterial, where findings and conclusions were not material to appeal.

**13. Appeal and error ⊕⇒1004(1)—Question of damages for publication of libel was for trial court.**

In suit for libel against a newspaper for publishing articles imputing plaintiff to be head of bootlegging and smuggling forces, question of damages was for court.

Appeal from District Court, Victoria County; John M. Green, Judge.

Action by C. A. Keeran against the Express Publishing Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Denman, Franklin & McGown, of San Antonio, Dougherty, Dougherty & Tarlton, of Beeville, and T. R. Wood, of Victoria, for appellant.

Fly & Ragsdale, Proctor, Vandenberge, Crain & Mitchell and V. B. Proctor, all of Victoria, for appellee.

SMITH, J. This appeal is from a judgment of $15,000 actual damages recovered by appellee, C. A. Keeran, from the Express Publishing Company, on account of the publication in the San Antonio Express of certain alleged libelous statements concerning appellee. The cause was tried before the court without a jury. The publications complained of appeared in three issues of the newspaper, dated July 12, 13, and 14, respectively, in the year 1924, and were as follows:

"Dozen Arrests in Giant Booze Case Forecast.

"Ranger Captain Claims Plot Extensive.

"Thinks He Has Solved Mystery of Source of San Antonio's Foreign Liquor Supply.

"Starting with a one-quart bottle of liquor in San Antonio as a clue, arrest of a dozen persons in a giant liquor conspiracy case extending from New Orleans to North Texas and beyond is expected to take place, according to prediction of Capt. B. C. Baldwin, state ranger.

"Claude Keeran, widely known ranchman of San Antonio and Victoria county, appeared before United States Commissioner Wiegand at Victoria on Friday morning, waived examination, and was immediately released on bond of $3,000. Charges of violating the Tariff Act of 1922 and the Prohibition Act were filed against Mr. Keeran. No testimony was taken before the commissioner, and few in Victoria Friday knew of the incident. Victoria is in the same federal district as Houston.

"Two other men were also arrested at Victoria late Friday, Capt. Baldwin reported. And arrest of a dozen in all in different parts of the state are expected to follow.

" 'It is a giant conspiracy from New Orleans to North Texas and even farther,' Capt. Baldwin declared. 'These arrests will dry up this part of the state. We are expecting to arrest a dozen in all.'

"The Olga was seized at Port Lavaca, Thursday. For some time liquor has been landed in Texas through this port, according to state rangers and customs officials.

"The uncovering of the conspiracy resulted from the seizure of a quart bottle of liquor in J. B. Swift's home in San Antonio, Capt. Baldwin said. Later an entire truckload of goods was captured by state rangers at the same place. The load, more than 300 quarts of bonded liquor, was disguised under camping equipment. Next came the seizure of .235 quarts of bonded goods at a place at 124 Furnish avenue, disguised in a shoe polish box.

"Following up the quart bottle clue, which was unearthed by Customs Inspector John H. Dewees, Inspectors Scharff and Dewees went immediately to Victoria, where they were joined in the case by State Rangers John Gillons and Y. H. Taylor. Inspector Dewees returned to San Antonio on Friday night and Scharff is expected to return Saturday."

"Rum Smugglers Believed Escaped.

"Some of Officers Have Little Hopes of Making Arrests Forecast.

"Developments in the liquor conspiracy, thought to be supplying smuggled goods from New Orleans to North Texas and beyond, were at a standstill Saturday so far as arrests were concerned. Some of the officers frankly admitted that they had little hopes of making the dozen arrests forecast Friday. Others, more optimistic, however, expressed confidence that arrests will be forthcoming.

"Reports from Galveston received in San Antonio late Saturday said that further developments are expected there following the seizure of the fishing schooner Olga at Port Lavaca and the arrest of two men at Victoria—Claude A. Keeran, wealthy stockman, and Ralph Kitchen, a negro. A. F. Scharff, special agent of the treasury department, left Galveston for Victoria Friday night.

"Meanwhile two automobiles are in possession of custom house authorities, having been brought to Galveston from Victoria county Friday. One is said to belong to Mr. Keeran, who is under $3,3000 bond, and the other to Kitchen, who is under $750 bond. Three cases of liquor were said to have been found in one of the cars.

"No liquor was said to have been found on

---

⊕⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

the Olga. Her skipper, a negro, and several men who were on board, are being detained."

"Two Held in Rum Plot.

"Houston Requests Arrests.

"Both Arraigned before U. S. Commissioner.

"Two San Antonio men, J. B. Swift, 116 Weymouth street, and Jim Bell, address not given, were arrested Sunday in connection with what U. S. customs men and Texas rangers have characterized as a gigantic rum smuggling ring operating between the Texas and Louisiana coasts and cities in the interior.

"The arrests here were made at 3:30 Sunday afternoon on the request of Houston authorities. The two men were taken before U. S. Commissioner Edwards and were committed awaiting further information from Houston.

"The two men, according to customs officials here, have been wanted in connection with al- leged operations of the smuggling ring on the Lavaca Bay shore."

The facts claimed by appellant to justify the publications are voluminous in detail, and difficult to encompass in a general statement. It appears that appellee owns and operates a large ranch east of the city of Victoria and fronting 13 miles on the Lavaca Bay shore. At the time in question he resided on his ranch with his family, consisting of his wife and three minor children, a son and two daughters. He was 62 years old, had resided in that vicinity for 57 years, and on the ranch for many years. He also maintains a residence in the City of San Antonio. According to the trial court's findings, not challenged here, appellee had at all times a wide circle of friends in Victoria and Bexar counties and throughout Southwest Texas, had repeatedly served on grand and petit juries of Victoria county, and his character and reputation were good.

Several months before the occurrence of the transactions here in controversy, appellee was in San Antonio, and by invitation attended a so-called "party" given by a group of oil operators in a guest room of a local hotel. During the evening the party drank three bottles of Scotch liquor, supplied by one Bert Barkley at $10 a bottle, one of which appellee paid for. In this way, and to that extent, appellee became acquainted with Barkley, called there by one of the other guests. One night a few months later, four men in two Ford cars drove up to appellee's ranch home and asked for appellee, who responded. It turned out that one of the four was Barkley, who recalled himself to appellee by reference to the incident in the San Antonio hotel. He then told appellee that he and his associates had a boat load of liquor which had been unloaded at a designated point on appellee's ranch and asked the latter to go with them and show them the way to the point. He agreed, on condition that they would drive him back to his home. Accordingly, the party proceeded in the visiting

cars through the ranch to the designated point, about 8 miles distant. Arriving, they observed a small two-masted fishing schooner at anchor a short distance from shore, and upon a signal from one of Barkley's companions the negro master of the boat waded ashore, and, upon being asked where the liquor, was, pointed it out to them on the beach near by. The liquor was contained, some of it in cases labeled "Canadian Club Whisky" and the remainder in gunny sacks, the bottles in which were labeled "White Label," "White Horse Scotch Whisky," and "Gordon's Dry Gin." Some of the packages bore the stamp, "via Havana." One of the bootleggers opened a bottle of gin, and each of the party, including appellee, took a drink. Some of the sacks of liquor were loaded into one of the Ford cars, driven by a negro, Ralph Kitchen, who drove it out through the ranch, appellee riding therein as far as his home, where he alighted, and the driver continued on, presumably to San Antonio.

The next morning appellee's brother-in-law, who seems to have been living at the latter's home, was told by appellee of the cargo of liquor, whereupon the two drove down to the point to "see the sight." They found Barkley at the cache, loading some of the liquor into a truck, which appeared to have arrived over night. Appellee and his brother-in-law asked Barkley to sell them some of the liquor for their personal uses, but the latter, refusing to sell, made a present of 18 bottles to appellee and 6 bottles to his brother-in-law. They accepted the gift and took it home for their own uses. On this visit appellee says he was informed, or received an impression, that other liquors were stored across the bay from this cache, and perhaps at other nearby points, to be brought across later on by the fishing boat. The liquor cached at the point was hauled out by Barkley's crowd, through the ranch and presumably on to San Antonio. This required several days, and appellee was aware of the activity, although in no way concerned therein, and having no further interest in or connection with the entire transaction, except as will now be stated.

Two or three weeks after the above incident, Barkley called appellee at the latter's San Antonio residence and informed him that 50 cases of the cargo of liquor had been stolen from its cache on appellee's ranch. From the circumstances told him, appellee at once apprehended that some of his employees, or others on his ranch were responsible for the theft, and told Barkley he would, in that case, see to it that the stolen goods were restored to Barkley. Upon returning to his ranch shortly thereafter, appellee investigated and ascertained that some of his negroes, and his 17 year old son had taken the missing liquor, and he set about to restore it.

He went to some trouble to do this. He found that most of the stolen goods had been returned directly to the bootleggers by those who had taken it, but appellee himself located three cases of Gordon gin, which his son had taken, and which in turn had been stolen from the son by a negro. Appellee got possession of these three cases, put them in his car, and started out to restore it to the bootleggers. On the way to his destination, however, he met a customs agent and some state rangers who discovered the liquor in his car, arrested him, and filed a complaint against him upon the charge:

"That on or about the 3d day of July, 1924, at about 20 miles east of Victoria, Victoria county, in said district, C. A. Keeran, in violation of section 593, par. B, of the Tariff Act of 1922, and sections 3, 6, and 26, tit. 2, Act of October 28, 1919, the National Prohibition Act of the United States, did unlawfully possess and transport three cases of smuggled Gordon gin in a Buick automobile, contrary to the form of the statute in such cases made and provided and against the peace and dignity of the United States of America."

After his arrest and release on bond, appellee assisted the officers in locating the cached liquor. We think the foregoing is a fair statement of appellee's connection with the transaction in controversy. The record contains a great mass of other testimony given by the customs inspector and two or three state rangers engaged in the investigation of the transaction and arrest of appellee and the other parties named in the newspaper articles, but this testimony did not materially differ from the voluntary statement made by appellee at the time of his arrest and placed in evidence by appellant upon the trial of this cause. The record does not appear to show any other arrests in the transaction than those indicated in the publications complained of, or any prior or subsequent rum activities in the vicinity in controversy, nor does it show that the prosecution of appellee or the other apprehended parties was pressed to judgment, or what became of the prosecutions.

The facts disclosed by an analysis of the foregoing details may be summarized as follows: Appellee had no knowledge of the existence of the one cargo of liquor in question until it had been dumped upon land which happened to belong to him, when he was apprised of the fact by its owners. Upon the latter's invitation he visited the cache, accepted 18 bottles of the liquor as a gift from the owners, and appropriated it to his personal use, and permitted, at least by not forbidding, the owners to move the cargo across his premises to the interior for the obvious purpose of sale. When told that some of the liquor had been stolen from the cache on his place, and apprehending that it had been stolen by his own people, including his employees, and even his own son, he seemed to feel constructively responsible, as if for a breach of hospitality, even though such hospitality was of doubtful virtue. So, he set about to procure the restoration of the stolen property to its owners, notwithstanding they were obvious vendors in an unlawful traffic. The trial court found, upon apparently sufficient evidence, that appellee was prompted to this activity by a desire to protect his 17 year old son from prosecution which might follow any sale of the stolen liquor in event it should be traced back to his son. In endeavoring to restore this liquor to its owners, appellee himself recovered three cases, took possession of it, and while on the way to deliver it to its owners he was apprehended and arrested for possessing and transporting that particular liquor, which the arresting officers assumed had been smuggled into the country. Appellee was not otherwise interested in the cargo. He knew nothing of its existence until after it was landed on his premises. He did not know where it came from. He had no pecuniary interest in it. However reprehensible his connection with the transaction was, it was at most purely accidental and casual.

[1] Appellant depends upon and stresses its contention that the cargo of liquor was "smuggled" into this country, but there was no evidence to support this contention. The only evidence which could be construed into this relation was of doubtful probity, and, if it was material and tended to establish appellant's contention, the trial court obviously disbelieved it, as it had the right to do. From the evidence it is shown that the fishing boat from which the liquor was unloaded operated only in the bays, never ventured into the Gulf, and therefore could not have brought its cargo from foreign lands. So was there evidence, also of doubtful probity, that the cargo was transferred to the fishing schooner from a larger boat, plying from New Orleans. But that fact did not even tend to show the cargo to have been smuggled, since New Orleans is a domestic and not a foreign port. It is true also that the liquors bore labels indicating foreign brands, and some of it was marked "via Havana." But these labels and marks do not establish a case of smuggling, since it appears the cargo originated at New Orleans, if indeed there was any evidence warranting an inference as to the point of origin. Besides, it is a matter of perhaps general information or possibly of common knowledge, gleaned promiscuously from personal experiences, observations, and constant promulgation from the magazines, newspapers, and other periodicals of our country, that these and similar alluring labels on liquor containers raise no presumption whatever that the contents were not brewed in an adjoining bay, cove, county, precinct, city, alley, or even backyard. There was no competent evidence in this case that this cargo of liquor had been smuggled

into Lavaca Bay, where it was unloaded, and in no event was appellee charged with knowledge of its place of origin.

Appellant's first proposition or point of law is that—

"The findings of fact and conclusions of law of the trial court, and the judgment for appellee, are each without any evidence to support them. Each of the alleged libelous publications is privileged for publication, because (a) each contains a fair, true, and impartial account of the proceedings in a court of justice not prohibited from publication by the court; (b) each contains a true and impartial account of official proceedings authorized by law in the administration of the law; (c) each contains a reasonable and fair comment or criticism of matters of public concern, and was published for general information; (d) each publication is shown by the undisputed evidence to be true in substance and in fact; (e) there is neither allegation in plaintiff's petition nor any evidence that either of the publications was made upon actual malice towards plaintiff; (f) the publishing of each of the publications was induced by appellee."

[2] It will be observed that this proposition embraces the whole case and of its own force presents five different propositions of law. It is predicated upon thirty separate and distinct assignments of error, in each of which complaint is made of a specific issue, some of law and others of fact. The proposition is in direct contravention of the rules prescribed for this court by the Supreme Court, and, had appellee objected to its consideration upon that account, we would have been obliged to disregard it in toto. However, we have concluded, in the absence of objection, to consider the proposition and dispose of it in the form submitted.

[3, 4] It is first contended that each of the libelous articles is privileged for publication because it "contains a fair, true, and impartial account of the proceedings in a court of justice." We will consider this proposition as if the complaint filed before a United States commissioner is such proceeding in a court of justice as is contemplated in the libel laws. This assumption reduces the inquiry to the question of whether or not the publications, which must be considered together, constituted a fair, true, and impartial account of that proceeding. The complaint charged appellee with the violation, as an individual, of section 593, par. (b), of the Tariff Act of 1922 (Comp. St. Ann. Supp. 1923, § 5841h–13), and of the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.), in that he did unlawfully possess and transport three cases of smuggled Gordon gin in a Buick automobile. In short, it was charged in the complaint that appellee had possessed and transported three cases of Gordon gin, knowing the same had been imported or brought into the United States contrary to law. Upon this simple complaint the newspaper heralded to the world, by direct state-

ments or by necessary or reasonable implication, that appellee was the principal in a "giant booze case," of an "extensive plot," of a "giant liquor conspiracy, extending from New Orleans to North Texas and beyond;" of a "giant conspiracy from New Orleans to North Texas and even farther," of a gang of "rum smugglers," of a "liquor conspiracy supplying smuggled goods from New Orleans to North Texas and beyond," of a "rum plot," of a "gigantic rum smuggling ring operating between the Texas and Louisiana coasts and cities in the interior," of a "smuggling ring on the Lavaca Bay shore." It was further published that this conspiracy had been operating some time, landing liquor through Port Lavaca, supplying smuggled liquors to the large territory described in the publications and hereinabove mentioned; that the arrest of appellee and two others, one of them a negro, had enabled a ranger captain, far removed from the scene of operations, to solve "the mystery of the source of San Antonio's foreign liquor supply," and would "dry up" Southwest Texas—in short, that appellee was the head and front and the controlling influence of all the smuggling and bootlegging forces supplying a vast territory with intoxicating liquors. It should be added that a further necessary inference was that appellee was leading these forces as a commercial venture, and disposing of the vast quantities of liquor as a business, and, of course, for profit. We adopt the findings of the trial court that this was not, as appellant contends in its first proposition, (a), a "true and impartial account" of the complaint filed by the federal agent against appellee for "possessing and transporting three cases of Gordon gin"; nor was it (b) "a true and impartial account of official proceedings authorized by law in the administration of the law"; nor (c) a "reasonable and fair comment or criticism of matters of public concern and published for general information"; nor was it (d) "true in substance and in fact" or either of them; nor was the publication "induced by appellee," as appellant finally charges in its first proposition, which is overruled at large.

[5, 6] Appellant alleged in its petition, and offered in evidence, an ex parte affidavit of the negro, Ralph Kitchen, the bootlegger companion of Barkley, the apparent leader of the gang owning the cargo of liquor. On exception, the trial court struck this affidavit from appellant's answer, and sustained objection to its admission in evidence. Among the objections to this evidence and pleading was that the statement was ex parte, and its admission would deny to appellee the right of cross-examination, was hearsay, and was not the best evidence of any fact stated therein. The objections were, as a matter of course, good, and were properly sustained. This negro appears to have been present in the courtroom when these matters were pre-

sented. If appellant desired the benefit of his testimony, it should have had him sworn and put on the stand. And in any event his ex parte statement had no proper place either in the pleadings or evidence. The second and third points, relating to these matters, will be overruled.

[7] Appellant took the deposition of one Gillon, a state ranger, and put in evidence his answers to direct interrogatories propounded to him by appellant, whereupon appellee, over appellant's objection, introduced his answers to cross-interrogatories propounded to him by appellee. This is complained of in appellant's fourth point, which we overrule. In the testimony complained of Ranger Gillon told the circumstances of a visit made by him, another ranger, and a customs inspector, to appellee's ranch home, during appellee's absence, when they surrounded the house, and the witness in appropriate voice, from the front steps, commanded, "All you crooks come out with 'your hands up!" or words to that effect. This command was responded to by appellee's wife, minor daughter, minor son, his wife's brother, and possibly a house maid; they constituting all the occupants of the house at the time. Each of the three officers was armed with a rifle and six-shooter; the former drawn and ready for use. They told appellee's wife they were "looking for two bootleggers," whereupon Mrs. Keeran denied that the bootleggers sought were there, and invited the officers to search the house, which they did. Their search was in vain, as appellee's family were not harboring the bootleggers. With homely hospitality—not wholly unlike the mistaken spirit of hospitality which prompted her husband to find and restore the property, even of bootleggers, which had been stolen from his premises by his own employees—Mrs. Keeran invited the officers to have dinner with her family, the hour having arrived. They accepted, and all broke bread in appellee's home. After dinner the officers left, proceeded a short distance, met appellee on the road, stopped him, told him of their search of his home in his absence, apologized to him therefor, looked into the tonneau of his car, discovered the three cases of gin he was returning to the owners, arrested him, and subsequently filed the charge which set Capt. Baldwin to talking and the Express to quoting in the lurid and outrageously exaggerated terms which resulted in this litigation.

Now appellant objected to the introduction of this cross-examination of Ranger Gillon, who was the spokesman at the raid made on appellee's home. The objections are that the testimony "was not competent for any purpose, was irrelevant to any issue in the case, and appellant could not be held responsible in any way for anything that was said or done by the witnesses at that time." It is unnecessary to pass upon the force or effect of those objections to this testimony, for the reason that appellant itself brought out substantially the same facts in its direct examination of the witness named, which rendered the supposed error harmless. For the same reason there was no reversible error in the admission of the testimony of Inspector Dewees and Ranger Taylor.

[8] In its fifth proposition appellant complains of the exclusion of the answer of the witness Dewees to a certain interrogatory propounded to him. As no bill of exception appears to have been taken to the action of the court, the point made thereon will be overruled.

[9, 10] The appellant offered to prove by the witness Miss Smith, an employee of the Express Publishing Company, and one of the reporters of the San Antonio Express, that she wrote the articles of July 12th and 13th, and that before she wrote them she obtained the facts stated therein from Mr. Ed. Cotulla, an agent and employee of the United States government in its customs service at San Antonio, and from Capt. B. C. Baldwin, a state ranger in the employ of the state of Texas, and that said publications set out substantially the facts as stated to her by said Cotulla and said Baldwin. The court excluded this testimony upon appellee's objections that it was irrelevant, and that the only defense available to defendant in the case was the truth of the matters stated in the articles, and that the fact that federal or state officers had told such alleged facts to the reporter did not tend to prove the truth of same, and was a mere attempt to introduce hearsay testimony obtained from Cotulla and Baldwin. We think the testimony was properly excluded. The cause of action asserted by appellee was for actual damages only, and the question of punitive or exemplary damages, to which alone would the proffered testimony have been material, was not in the case. When the newspaper reported or quoted the statements of these officials, it did so at its own risk of their accuracy, and was responsible for their full import. It is the duty of newspapers and other periodicals to be sure of their grounds before proclaiming the guilt of citizens of high crimes and misdemeanors. If the officials in question made the charges imputed to them in the newspapers, then the very nature of those charges and the character of the citizen assailed should have induced the publisher to use extreme caution before flaunting them before the public, especially when the very language of at least one of the officers, if correctly quoted by the newspaper, indicated a possible disposition to exaggerate and advertise his prowess and acumen. The testimony of the proffered witness does not appear to have been material, and appellant's sixth point will be overruled.

[11, 12] In its seventh point appellant complains of the trial court's ninth, twelfth, and

fifteenth findings of fact, and first and second conclusions of law, each finding and conclusion relating to a distinct issue and question. The point is objectionable as being multifarious, but we have nevertheless considered it, and overrule it, because the findings and conclusions are not deemed material to the appeal. For like reasons the eighth and ninth points are overruled.

[13] In its tenth point appellant asserts that the judgment, which was for $15,000, was excessive. We think the question was for the trial court's decision, and that the amount of the judgment is amply supported by the evidence.

The judgment is affirmed.