## EXPRESS PUB. CO. v. KEERAN.
### (No. 628—4488.)

(Commission of Appeals of Texas, Section B.
June 9, 1926.)

**1. Libel and slander ⬥19.**

Sense in which ordinary reader will construe and understand newspaper article is test of whether it is libelous.

**2. Libel and slander ⬥112(2)—Newspaper articles relating to defendant's arrest for transporting smuggled liquor held under evidence to be a fair, true, and impartial account of official proceedings respecting matter of public concern (Vernon's Ann. Civ. St. Supp. 1922, arts. 5595–5597; Tariff Act, § 593, par. B [U. S. Comp. St. Ann. Supp. 1923, § 5841h13]; National Prohibition Act, tit. 2, §§ 3, 6, 26 [U. S. Comp. St. Ann. Supp. 1923, §§ 10138½aa, 10138½c, 10138½mm]).**

Under Vernon's Ann. Civ. St. Supp. 1922, arts. 5595–5597, newspaper articles stating that plaintiff was arrested for transporting smuggled liquor in violation of Tariff Act, § 593. par. B (U. S. Comp. St. Ann. Supp. 1923, § 5841h13) and National Prohibition Act, tit. 2, §§ 3, 6, 26 (U. S. Comp. St. Ann. Supp. 1923, §§ 10138½aa, 10138½c, 10138½mm), and that his arrest led to uncovering of gigantic smuggling conspiracy, though libelous per se, *held* under evidence to have been a fair, true, and impartial account of official proceedings relating to matter of public concern.

**3. Libel and slander ⬥48(2)—"Fair comment or criticism" of official proceeding or act carries permission to draw reasonable and fair inferences from facts (Vernon's Ann. Civ. St. Supp. 1922, arts. 5595–5597).**

"Fair comment or criticism" of official proceeding or act permitted under Vernon's Ann. Civ. St. Supp. 1922, arts. 5595–5597, necessarily allows reasonable and fair latitude and drawing of any reasonable and fair inference from facts.

**4. Libel and slander ⬥48(1)—Right of newspapers to make fair comment and criticism on matters of public concern must at all times be protected and never denied (Vernon's Ann. Civ. St. Supp. 1922, arts. 5595–5597).**

Though right of citizen to have his good name protected from libelous publication is valuable one, not to be lightly disregarded, the right of newspapers to make reasonable and fair comment and criticism on matters of public concern for general information, under Vernon's Ann. Civ. St. Supp. 1922, arts. 5595–5597, is at all times to be protected and never denied.

Error to Court of Civil Appeals of Fourth Supreme Judicial District.

Action by Claude A. Keeran against the Express Publishing Company. Judgment for plaintiff was affirmed by the Court of Civil Appeals (274 S. W. 335), and defendant brings error. Reversed and rendered.

Denman, Franklin & McGown, of San Antonio, Dougherty, Dougherty & Tarlton, of Beeville, and T. R. Wood, of Victoria, for plaintiff in error.

Proctor, Vandenberge, Crain & Mitchell and Fly & Ragsdale, all of Victoria, for defendant in error.

SPEER, J. C. A. Keeran recovered judgment against Express Publishing Company in the district court of Victoria county in the sum of $15,000, for libel, which judgment on appeal was affirmed by the Court of Civil Appeals. 274 S. W. 335. The action was based upon the publication in the San Antonio Daily Express of the following articles:

"Dozen Arrests in Giant Booze Case Forecast.

"Ranger Captain Claims Plot Extensive Thinks He has Solved Mystery of Source of San Antonio's Foreign Liquor Supply.

"Starting with a one-quart bottle of liquor in San Antonio as a clue, arrest of a dozen persons in a giant liquor conspiracy case, extending from New Orleans to North Texas and beyond, is expected to take place, according to prediction of Captain B. C. Baldwin, state ranger.

"Claude Keeran, widely known ranchman of San Antonio and Victoria county, appeared, before United States Commissioner Wisgand at Victoria on Friday morning, waived examination, and was immediately released on bond of $3,000. Charges of violating the Tariff Act of 1922 and the Prohibition Act were filed against Mr. Keeran. No testimony was taken before the commissioner, and few in Victoria Friday knew of the incident. Victoria is in the same federal district as Houston.

"Two other men were also arrested at Victoria late Friday, Captain Baldwin reported, and arrest of a dozen in all in different parts of the state are expected to follow.

"'It is a giant conspiracy from New Orleans to North Texas and even farther,' Captain Baldwin declared. 'These arrests will dry up this part of the state. We are expecting to arrest a dozen in all.'

"The Olga was seized at Port Lavaca Thursday. For some time liquor has been landed in Texas through this port, according to state rangers and customs officials.

"The uncovering of the conspiracy resulted from the seizure of a quart bottle of liquor in J. B. Swift's home, in San Antonio, Captain Baldwin said. Later an entire truck load of goods was captured by state rangers at the same place. The load, more than 300 quarts of bonded liquor, was disguised under camping equipment. Next came the seizure of 235 quarts of bonded goods at a place at 124 Furnish avenue, disguised in a shoe polish box.

"Following up the quart bottle clue, which was unearthed by Customs Inspector John H. Dewees, Inspectors Scharff and Dewees went immediately to Victoria, where they were joined in the case by State Rangers John Gillons and Y. H. Taylor. Inspector Dewees returned to San Antonio on Friday night and Scharff is expected to return Saturday."

"Rum Smugglers Believed Escaped.

"Some of Officers have Little Hopes of Making Arrests Forecast.

"Developments in the liquor conspiracy thought to be supplying smuggled goods from New Orleans to North Texas and beyond, were at a standstill Saturday so far as arrests were concerned. Some of the officers frankly admitted that they had little hopes of making the dozen arrests forecast Friday. Others, more optimistic, however, expressed confidence that arrests will be forthcoming.

"Reports from Galveston, received in San Antonio late Saturday, said that further developments are expected there following the seizure of the fishing schooner Olga at Port Lavaca and the arrest of two men at Victoria—Claude A. Keeran, wealthy stockman, and Ralph Kitchen, a negro. A. F. Scharff, special agent of the Treasury Department, left Galveston for Victoria Friday night.

"Meanwhile two automobiles are in possession of custom house authorities, having been brought to Galveston from Victoria county Friday. One is said to belong to Mr. Keeran, who is under $3,000 bond and the other to Kitchen, who is under $750 bond. Three cases of liquor were said to have been found in one of the cars.

"No liquor was said to have been found on the Olga. Her skipper, a negro, and several men who were on board, are being detained."

"Two Held in Rum Plot.

"Houston Requests Arrests.

"Both Arraigned Before U. S. Commissioner.

"Two San Antonio men, J. B. Swift, 116 Weymouth street, and Jim Bell, address not given, were arrested Sunday in connection with what U. S. customs men and Texas rangers have characterized as a gigantic rum smuggling ring operating between the Texas and Louisiana coasts and cities in the interior.

"The arrests here were made at 3:30 Sunday afternoon on the request of Houston Authorities. The two men were taken before U. S. Commissioner Edwards and were committed awaiting further information from Houston.

"The two men, according to customs officials here, have been wanted in connection with alleged operations of the smuggling ring on the Lavaca Bay shore."

The defendant in error, though present, did not testify upon the trial. The record, however, contains the following statement made by him during the course of the investigation by the prohibition enforcement officers:

"Q. Mr. Keeran, you were apprehended by customs officers near Victoria, Tex., on the 3d day of July, 1924, while in the act of transporting three cases of imported Gordon gin in your Buick automobile. You have made certain statements to the officers concerning this liquor, also the circumstances under which you obtained possession of same, and, for the information of the United States attorney, I am going to ask that you give a detailed résumé of the happenings and circumstances which led up to and are involved in the seizure of the three cases of Gordon gin from you yesterday, bearing in mind that what you say at this time may be used for or against you by the United States attorney.

"A. I am 62 years old, and have resided in the vicinity of Victoria, Tex., some 57 years. I am married and have three children who reside with my wife and me on my ranch in Victoria county, Tex. My ranch, which consists of about 25,000 acres, is situated about 8 miles south of Inez, Tex., and some 20 miles east of Victoria, Tex. Among other businesses, I am interested in the Victoria National Bank, Victoria, Tex. Several months ago, while in San Antonio, Tex., I was present at a little party given in the St. Anthony Hotel by several oil operators, and during the evening we consumed one or two bottles of Scotch whisky. One of the men present, whose name I cannot recall at this minute stepped to the telephone and called * * * and said: 'Bring me up one,' A short time later, a man came up to the room with a bottle of Scotch whisky, and was introduced around as Bert Barkley, and we were advised that, if we wanted any liquor, Barkley was all right and would furnish us with liquor. Later on the same day, two more bottles of Scotch whisky were ordered and brought up by Bert Barkley, and I paid for one of them. All told, our crowd gave Barkley about $30 that day for the three bottles of liquor. After my visit to San Antonio I went back to the ranch.

"Along about the 16th or 17th of June, 1924, I was in my home at the ranch about 8 o'clock in the evening, when my attention was called by one of the servants, either Pearl or Maude, that two automobiles had stopped in front of the house. The servant advised me that there was a man outside that wanted to see me, and I went out to the cars and found Bert Barkley, W. T. White, and Ralph Kitchen. The automobiles were Ford coupés, and I have since seen those coupés several times. When I got out to the automobiles that night I did not recognize any of the men at first, and Barkley spoke up and told me who he was, and I remembered him as the man I had met at the St. Anthony Hotel. Ralph also told me who he was, and while I did not remember Ralph Kitchen at that time, I know all of his relatives at Port Lavaca—the Kitchen negroes. I met W. T. White for the first time that night. After talking a little while, these men told me that they had a boat load of liquor down on the point which is on my property, and invited me to go along with them. I told them I would go provided one of them brought me back, and I got into the car with Kitchen, and led the way on down through four gates and out onto the point, about 7 or 8 miles from my home. When we arrived at this point, I could see a boat anchored out in the bay some little distance. We could not see any liquor and stopped our cars, and some one signaled the boat, and a short time later a negro waded ashore from the boat and directed us to where a pile of gunny sacks were stacked on the beach. One of the men opened a bottle of gin after we arrived at the sacks, and we all had a drink. A number of sacks of liquor were loaded into Kitchen's Ford car. I got in the car with Kitchen and rode as far as my home with him, and it is my understanding that he continued on into San Antonio with the load.

"The next morning, I told my brother-in-law, Mr. Ted Raubold, who was visiting me at that

time, about the bunch of liquor I had seen the night before, and suggested that if he wanted to see 'a sight' that we would go down and look it over. This we decided to do, and, when we arrived at the place on the point where I had been the night before, we found Barkley and White in the act of loading the sacks of liquor in a big truck and the other Ford coupé. The night previous, I had not seen the big truck, and I do not know where it came from. My brother-in-law and I tried to buy two cases of assorted whiskies from Barkley and White, but they refused to sell us the liquor. They made me a present of three sacks of whisky, each sack containing 6 quarts. There was Canadian Club whisky, White Label and White Horse Scotch whisky. They gave my brother-in-law one sack of White Horse whisky, and my brother-in-law and I returned to my home in my car. During our conversation on the beach while we were getting this whisky and the night prior when I visited this place with these men, I received the impression that there was more liquor concealed on the other side of the bay and at various other points in a radius of a few miles of where we were, and that the boat from which the negro came in answer to signals from our party would fetch more liquor later on. I do not remember just when the truck went by my house en route to San Antonio, but I do know that when it passed it was loaded, and I think that White was driving the truck, but I am not positive. To the best of my recollection, the Ford came out afterwards, not very far apart. I came to San Antonio on June 23d to attend the Masonic convention here, but before I left Barkley, White, and Kitchen made about three trips by my place, to and from San Antonio, in the two Ford coupés and the truck with loads. Their last trip, I believe, was on Saturday, June 21st; floods prevented automobile traffic Sunday and part of Monday. I made an effort to come to San Antonio, and was unable to cross Garictas creek bridge, on Sunday. I telephoned to Inez Monday to have a car meet me on the Inez end of the bridge. I drove up to and across the bridge in a buggy; went on into Inez in a car, where I caught the train to San Antonio. Some time Tuesday, Bert Barkley called me on the telephone in San Antonio at my home, 315 W. Magnolia, and told me that some one had stolen fifty cases of liquor from him on the ranch. I invited him to come out to the house and tell me about it; when he arrived at the house, he explained that fifty cases of liquor had disappeared from a cargo that had been left on my ranch, and I told him that undoubtedly I could locate the whisky for him, as the only people in the country who could have taken it were some of the negro men on my ranch, and that I would make every effort possible to locate the liquor for him. I believed at that time that Frog Charlston had taken the liquor, and when I went back to the ranch on June 29th I began to inquire around concerning the disappearance of the liquor, and from another negro by the name of Cube Brooks I learned that Frog Charlston and Sam Charlston had stolen the liquor, and I started out to find Frog. I looked all over the country for him but could not find him; I did, however, see Barkley and Kitchen in Victoria a day or two later, and told them that Frog and Sam had their liquor. They told me then that I

need not bother any more about the liquor, that they would get it. I went back to the ranch and later Frog came to me and told me he had heard I was looking for him. I told him, 'Yes; I want to know what you did with that liquor.' Frog answered that 'They (these three men) had already gotten all the liquor that he had taken from them except 5 cases of gin,' and he further stated at that time that he wanted to turn the liquor over to me if I would protect him; that he was afraid that these men would hurt him. After thinking the matter over, I decided that I would take charge of the liquor and deliver it to Barkley. After deliberating with myself for a while, I went with Frog to Sam's place, where they delivered approximately three cases of Gordon gin to me, and I was on my way to the ranch when apprehended by the officers yesterday. When I arrived at Sam's place with Frog, I was told that one of these negroes had told a deputy sheriff that some one had left two cases of gin at his (Sam's) house, and Frog and Sam told me to tell Mr. Barkley that they would pay him for the two cases of gin, and that is why I only took possession of the three cases of gin instead of the five. Later on, after my apprehension, I went with the officers back to Sam's place and assisted them in getting the two cases of gin there. The truck that I was shown by the officers a few minutes ago is the same truck that I saw at my ranch loaded with liquor at the time Barkley, White, and Kitchen were there.

"I hereby certify that I have read the above statement before signing, and that same is true and correct in every particular to the best of my knowledge and belief.

"[Signed] C. A. Keeran.

"Subscribed and sworn to before me this 4th day of July, 1924.

"A. F. Scharff,
"Special Agent, Acting in Charge."

The following facts, stated by plaintiff in error to be undisputed and not challenged by defendant in error, are taken from the application for writ:

"Keeran was arrested on complaint made before United States commissioner charging 'that on or about the 3d day of July, 1924, at about 20 miles east of Victoria, Victoria county, in said district, C. A. Keeran, in violation of section 593, par. B, of the Tariff Act of 1922 [U. S. Comp. St. Ann. Supp. 1923, § 5841h13], and sections 3, 6, and 26, tit. 2, Act of October 28, 1919 [U. S. Comp. St. Ann. Supp. 1923, §§ 10138½aa, 10138½c, 10138½mm], the National Prohibition Act of the United States, did unlawfully possess and transport three cases of smuggled Gordon gin in a Buick automobile contrary to the form of the statute in such cases made and provided and against the peace and dignity of the United States of America.' He made no plea to the complaint, but gave bond for his appearance before United States District Court. He was present in court at the trial of this case and did not go upon the witness stand.

"J. B. Swift was arrested in San Antonio, and it was found that he had a truck in a rented garage in that city containing 386 quarts of Canadian Club whisky and Scotch whisky; this liquor had come from Port Lavaca; that

when the rangers went to the Keeran residence in search of the bootleggers they found in the attic a large number of empty whisky bottles. When Keeran was arrested he told the officers that the liquor in his possession belonged to some bootleggers, and that his negroes had stolen it from the bootleggers.

"John A. Keeran told the officers, in the presence of Claude Keeran, that there was plenty of whisky in the house at the time they went through it, but that, between that time and the time when they got back to the house with Claude Keeran, he (Johnny Keeran) had taken all of the whisky out of the house and thrown it in the river.

"Claude Keeran stated to the officers that at the time he was arrested the bootleggers were making headquarters at Victoria, and not on his ranch.

"Swift and Bell and Ralph Kitchen were also all arrested and that there were some five or six persons, including Barkley and White, connected with the matter, who had not yet been caught. Both Bell and Barkley had previously been convicted for violating the liquor laws; that their reputation was that of professional bootleggers; that it was the practice for Swift and Bell to meet Kitchen and others between San Antonio and Seguin, take over the truck and coupé containing liquor and drive it into San Antonio; that the 386 bottles of whisky and gin found when Swift was arrested was 'foreign stuff,' that is, imported liquor. Three barrels of wine were found on the Keeran ranch. Keeran stated to the officers that the liquor had been smuggled into the country off of a boat and landed on the lower edge of his ranch from the boat; the liquor was transported on the Charles Buckingham of New Orleans, and that vessel had been seized and sold, as had also the schooner Olga of Port Lavaca, from which schooner the liquor was unloaded on the Keeran ranch.

"One officer testified that before going to the Keeran ranch he had been told that Keeran was mixed up in smuggling operations with the smugglers.

"Keeran stated to one of the officers that the liquor found in his possession had been stolen from the bootleggers and hidden on Keeran's place, and that the liquor in his possession when arrested he was carrying to his house for the purpose of redelivering it to the bootleggers.

"One of the officers testified that the information they had and upon which they acted in going to the Keeran ranch was that the two boats, the Buckingham and the Olga, had landed a load of liquor on Keeran's ranch, and that it was to be hauled by Kitchen and others to San Antonio, Tex., to be delivered to Barkley and Swift, and that there was being used in the hauling Ford coupés and one Oldsmobile truck. Keeran, in talking to this officer, stated that he knew that this kind of a dealing in liquor was going on, and that he had been to his ranch some two or three weeks before his arrest, and that the liquor had been piled up on the beach out there at that time. Keeran stated to the officer also that the bootleggers had often come by his house and talked to him and with him about the liquor; that the liquor had been hidden around at different places on his ranch, and that it took the bootleggers about 8 or 10 days to get it all hauled off;

that the liquor found in his possession was some of the liquor that had been so landed. The liquor found in Keeran's car was packed in sawdust in cases."

### Opinion.

There is no doubt but the articles constitute libel per se, and the judgment was therefore warranted, unless it can be said the truth of the statements therein contained has been shown, or that such publications are within the qualifiedly privileged matters provided in article 5597, Vernon's Texas Civil Statutes, 1922 Supp.

Article 5596 of the statute above provides:

"The truth of the statement or statements in such publication shall be a defense to such action,"

—while the article first cited declares:

"The publication of the following matters by any newspaper or periodical, as defined in article 5595, shall be deemed privileged, and shall not be made the basis of any action for libel without proof of actual malice: 1. A fair, true and impartial account of * * * any other official proceedings authorized by law in the administration of the law. * * * 4. A reasonable and fair comment or criticism of * * * matters of public concern published for general information."

There is no allegation of malice in connection with the present publications, so that the question is presented whether or not the articles, in connection with the undisputed facts of the case, justify the judgments rendered.

In questions of this kind each case is necessarily in a large measure to be determined by its own facts, and no useful purpose will be subserved by a review of other cases based upon different facts. We shall content ourselves with noting briefly our conclusions of law upon the facts of this case.

[1, 2] We do not think the judgment is supported by the evidence. In the first place, when the articles are read and construed in the sense that ordinary readers would understand them, and this is the test, we think it must be said that, with respect to defendant in error, they are true, and therefore this constitutes a complete defense to the action. This does not imply that defendant in error was guilty technically of the offense or offenses charged to him directly or by implication, but rather that the discovery, investigation, and charges made by the officers in connection with the matter as alleged in the articles are true, at least substantially true. In the next place, undoubtedly the proceedings published were "official proceedings authorized by law in the administration of the law," and therefore any newspaper had the right to publish "a fair, true, and impartial account" of such proceedings. Considering the nature of the matters involved, we construe the publication to be such fair, true, and impartial account. And

(284 S.W.)

further, it cannot be denied that the subject-matter of the articles was a matter "of public concern." The public is greatly interested in the observance upon the one hand, and the enforcement upon the other, of all laws, and especially the prohibition laws which affect so directly the public morals. In recognition of this, the law permits "a reasonable and fair comment or criticism of * * * matters of public concern published for general information." It will be observed the statute expressly permits "comment or criticism" as to such matters, and the measure of restraint upon such comment or criticism is only that it be "reasonable and fair comment" and be "published for general information."

[3] There is no room to differ in the conclusion that whatever of comment or criticism of defendant in error appears in the articles complained of, the same is both reasonable and fair, under the circumstances shown. Nor is there any contention that the publication was for any purpose other than for "general information." To permit comment or criticism of a proceeding or act is necessarily to allow reasonable and fair latitude in such matter. It necessarily carries with it permission to draw from the facts any reasonable and fair inference or conclusion. It is akin to the right of counsel to argue to the jury any conclusion or inference that any reasonable interpretation of the evidence would fairly justify. The articles do not charge defendant in error—certainly not expressly nor do we believe by necessary implication—with being the "principal" or "leading" spirit in the conspiracy suggested, but the inference that a conspiracy existed and that defendant in error played an important part therein—the gist of the charge—undoubtedly is true. But, if not absolutely true, nevertheless the inference that he did play such part would undoubtedly be within the "reasonable and fair comment or criticism" expressly permitted by law.

[4] The right of a citizen to have his good name protected from libelous publications is indeed a valuable one, not to be lightly disregarded. But the upholding of the law is likewise sacred, and the right of newspapers to make reasonable and fair comment and criticism upon matters of public concern for general information is at all times to be protected and never denied. Such comment or criticism, even when thoroughly justified, may of course be unpleasant to those involved. In this case, no doubt the publication, however justifiable, chafed and embarrassed defendant in error, but, if his conduct in such respect justified such comment or criticism, he has no just complaint. It is too late to quibble over the wisdom of our prohibition laws. All good people, irrespective of their views as to their original wisdom, respect them for the law's sake. The Court of Civil Appeals has in a measure palliated defendant in error's offense by referring to it in some of its parts as "homely hospitality." But "hospitality" to one's friends ceases where hostility to law and society begins. There is no more sacred right of government or duties of citizen, than the observance of law, and one of the most helpful means of cultivating a loyal observance, and aiding in the enforcement thereof, is the recognized right of the press to publish a reasonable and fair criticism of crime. It is a public service and makes for order.

We think, under the undisputed facts, the judgment should have been renderd for plaintiff in error, and we accordingly recommend that the judgment of both courts below be reversed, and judgment here be rendered for plaintiff in error.

CURETON, C. J. Judgments of the district court and Court of Civil Appeals reversed, and judgment rendered for plaintiff in error.